JOHN DOE, on the demise of JOHN PRITCHARD, *vs.* RICHARD ROE, casual ejector, and HENRY HENDERSON, tenant in possession.

*Ejectment—Costs, Security for— When Order not Granted—Practice — Witnesses—Exclusion from Room— When Not Excluded—Evidence—Opinion Based on Facts— Will—Testamentary Capacity — Undue Influence — Illegitimacy—New Trial; Motion for Based on Conversations of Counsel with Jurors.*

1.   In an action of ejectment the lessor or lessee are the real parties, and the rule as to security for costs applies.

2.   After the trial has commenced, the Court will not make an order requiring the plaintiff to give security for costs in a greater sum than already given, when it appears that the plaintiff is a poor man, and to make such order would be equivalent to an entry of nonsuit.

3.   Counsel will be permitted to state in his opening to the jury what he proposes to prove, unless it is manifest on its face that it is not competent proof.   It is not evidence, however, and if not supported by proof, the jury should be instructed to disregard it.

4.   When it is desired that all witnesses shall be excluded from the court-room, the application should be made at the commencement of the case.   If the appli-

cation is made after the opening of the case, and after testimony has been received, it will be refused.

5. The rule which permits but six witnesses to be examined on a side as to a single fact, does not apply where the matter inquired about is the mental condition of the testator. In such case the question relates not to a single point, but to a condition that grows out of a number of observations.

6. A witness, not being an attesting witness or expert, cannot express any opinion as to whether the testator was or was not of sound and disposing mind, untll he has stated the facts upon which he bases his opinion.

7. Questions as to the condition of the testator's mind, need not be directed to the time of the execution of the will. Incapicity growing out of insanity or other cause, may run back as far as you please, if it be traced up to the time of the will.

8. The Court will not permit a person who is engaged in the office of one of the counsel in the case, and takes part in the case, to be examined as a witness.

9. In actions of ejectment, the plaintiff recovers, if at all, upon the strength of his own title, and not upon the weakness of the title of the defendant, if any there be.

10. A statement of what, under the law and decisions of this State, constitutes a sound and disposing mind and memory; and also what amounts to undue influence.

11. Temporary association or conversation between the jurors and counsel, which is satisfactorily explained, will not require the setting aside of the verdict, if it be shown to have been of a non-prejudicial character, as where there is no conversation in regard to the case on trial.

12. When the jury was charged not to regard any statement of counsel not supported by the evidence, and there is nothing to show that any such statement affected the verdict, the verdict would not be disturbed for such a reason.

*(February 27, 1901.)*

LORE, C. J., and PENNEWILL and BOYCE, J. J., sitting.

*Anthony Higgins, Albert Constable* and *Joshua Clayton* for plaintiff.

*Charles B. Evans* and *J. Harvey Whiteman* for defendant.

Superior Court, New Castle County, February Term, 1901.

ACTION OF EJECTMENT (No. 78, November Term, 1899).

Counsel for defendant, on affidavit filed alleging that the plaintiff was a non-resident, obtained a rule for security for costs. On January 7th, 1900, at the hearing on the rule, counsel for plaintiff asked that the rule be discharged; contending that the statute (*Revised Code, 791–2*) having undertaken to deal with cases where there was an actual nominal plaintiff before the Court, did not apply to a case in which John Doe, a fictitious party, was plaintiff, as in the present case, and that, therefore, there could be no security for costs required in the present case. That the said statute had followed the ancient practice.

*1 Strange, 681.*

LORE, C. J.:—We think the whole function of the common law is practically brushed away by the consent rule entered into in this case, and makes the lessor and lessee the real parties to the suit, and that the rule ought not to be discharged.

Rule for security for costs in the sum of $200 was thereupon entered into by the plaintiff. At the trial, in February following, after a number of witnesses had been examined, counsel for defendant stated that it had developed that the amount of security named above was insufficient, and asked that a rule be laid on the plaintiff that said amount be increased to $500 within five days.

This was opposed by counsel for plaintiff, who claimed that the motion was unprecedented and it would be a great hardship upon the plaintiff, who was a poor man and could not give security in a larger amount than he had already given.

LORE, C. J.:—If the rule were granted or the order made, it would only be upon the penalty of the entry of nonsuit. Under the peculiar circumstances of this case, and the statement made by Mr. Constable, that this is a poor man and unable to give more security and right in the midst of the trial, to make an order that

would be equivalent to an entry of a nonsuit, would be, in our judgment, an unreasonable exercise of the power conferred by that statute. We, therefore, decline to make the order.

The above stated action was brought to test the title to certain real estate in the City of Wilmington. Both John Pritchard, the lessee of the plaintiff, and the defendant, Henry Henderson, claimed title under Caroline C. Pritchard. A paper writing purporting to be a will was alleged to have been executed in Maryland in January, 1896, and this paper was the principal subject of controversy in the case. At the time of her death in February, 1896, Caroline C. Pritchard was a resident of Cecil County, Maryland. At the trial, beginning February 14th, 1901, the following agreement between the respective counsel was filed: ·

" In the above case it is admitted as follows:

" I. That Caroline C. Pritchard died seized and possessed of the premises described in the declaration and consent rule.

" II. That the paper writing dated 28th of January, 1896, and purporting to be the last will and testament of Caroline C. Pritchard, was signed by said Caroline C. Pritchard in the presence of Samuel Stewart and Smith H. Rogers in her presence and in the presence of each other, as witnesses thereto."

The plaintiff claimed that John Pritchard was the legitimate child, and that Henry Henderson was the illegitimate child of Caroline C. Pritchard.

The defendant claimed that John Pritchard was not the child of Caroline C. Pritchard.

The issues arrising were, (1) as to the heirship of John Prichard, and (2) as to the validity of the will of Caroline C. Pritchard, which will bequeathed to John Pritchard one dollar, and gave all of the property of Caroline C. Pritchard to Henry Henderson, the defendant.

*Mr. Constable*, in stating to the jury what he proposed to prove, procedeed to give a history of the case, and referred to certain contests in Maryland between the same parties and as to what had occurred in the Maryland courts, and how the issues there tried were determined.

*Mr. Whiteman*, on behalf of the defendant, objected to plaintiff's counsel stating the history of the case, on the ground that the subject matter thereof would not be competent proof, and therefore could not be stated by counsel to the jury in his opening ; that the statement of what disposition was made of the case in the Maryland courts or what judgment was rendered upon the matter therein was analogous to stating to the jury what judgment was rendered below in an appeal case brought to the Superior Court from a Justice's Court; which the Court had uniformly ruled counsel could not do, and when such a statement had been attempted the same was held to be out of order, upon objection by counsel on the other side.

*Mr. Constable* stated that he was only stating, in good faith, what he proposed to prove to the Court; that he intended to offer in evidence the whole record of the case tried in the Maryland Court, duly certified under the act of Congress.

LORE, C. J.:—Counsel for defendant is asking us to decide what is or is not admissible here as evidence while the counsel for plaintiff is making his opening. This is not at all parallel with the case referred to of a judgment rendered by a Justice of the Peace. We say now, however, that whatever the counsel may say in his opening of this case is not evidence, and if not supported by the proof, we shall instruct the jury to utterly disregard all such statements. It is the uniform rule in such cases to allow counsel to state what he proposes to prove, unless it is manifest on its face that it is not competent proof. He is now stating his case as he says he can prove it; do you object to his stating that?

*Mr. Whiteman:*—That is right. I have made my objection.

LORE, C. J.:—The objection is overruled.
(Exception noted for defendant).

After the defendant had examined three witnesses, Mr. Whiteman, of counsel for defendant, asked that all the witnesses on both sides that had not been examined be excluded from the court room.

*Mr. Higgins:*—If it had been asked at first, it would have been another thing, but it seems to me that the request is made too late.

LORE, C. J.:—The uniform practice has been that if you wish to exclude the witnesses, it must be done at the commencement of the case. Your witnesses have heard all the testimony thus far adduced. I have never known a case where the application has not been refused when made after the opening of the case and after testimony has been received.

After the plaintiff had examined six witnesses as to the mental condition of the testatrix, Mrs. Carolina C. Pritchard, Mr. Whiteman objected to any more witnesses being called by the plaintiff upon that point, invoking the rule of Court limiting either side to six witnesses as to one fact.

LORE, C. J.:—That is as to proving one particular point. These witnesses do not speak as to one particular point; they get different points of observation; different facts and statements and observations which in the aggregate tend to one fact. For instance, if he were to bring ten witnesses to prove that there was a person standing outside there and you were to bring ten to prove he was not there, there is a single point, and we will limit you there to six witnesses. But here is a condition that grows out of a number of observations, and the rule in this case does not apply.

*Robert Jaquett*, a witness being recalled on behalf of the plaintiff, gave the following testimony:

*By Mr. Constable:*

Q. What sort of a woman was Henry Pritchard's wife, Caroline, mentally?

(Objected to by Mr. Whiteman, of counsel for defendant, because the witness had stated no facts upon which he could base an opinion as to the mental condition of Caroline C. Pritchard.)

LORE, C. J.:—The rule governing the evidence of persons who are not testamentary witnesses or experts, in respect to wills, is that they must state facts first, and then from those facts they may express an opinion. The objection is sustained. We think this question is not competent.

Q. How long did you know Caroline C. Pritchard?

A. Well, I knew her from 1848 to the time she was taken to the penitentiary.

Q. You saw her how many times after she came out of the penitentiary?

A. I saw her some few days after she came out and had some little talk; not a great deal.

Q. From 1848, how long until she went to the penitentiary— or rather, how much of her did you see?

A. How much?

Q. Yes; from 1848?

A. Well, I have been there.

Q. Did you see her intimately and talk with her?

A. Yes, sir; oftener than I have talked with you.

Q. That is pretty often?

A. Yes; I could not help but see her. I was as close to her as from here to the far end of the Court House. I worked that close to her. I passed the house; made it my business to see the old lady. I like her.

Q. That was from 1848 to 1853 that you were intimate with her?

A. Yes, sir; I was right there.

Q. You talked with her daily?

A. No, sir; it was not every day, but every day I could get out on that side.

Q. Say two or three times a week, would you talk with her?

A. Sometimes oftener than that, and sometimes not quite that often.

Q. How far did you live from her?

A. Well, the house I suppose was about two squares, as near as I can tell you, and part of the land of the farm that I lived on was in thirty yards of her house.

Q. What did you think of her condition mentally?

(Objected to by counsel for defendant because the ground had not been laid for asking the opinion of the witness.)

LORE, C. J.:—This witness can only express an opinion after he has stated the facts upon which he bases that opinion. He is not an expert, and can only give his opinion here from the facts he has stated to the jury, so that the jury may weigh the value of his statement as to his opportunities to judge of the mental condition of the testatrix. If he had any dealings with her, conversations with her upon any subject, he may state the same—we cannot indicate fully to you, but he must state facts.

Q. What did you talk about?

A. Oh well now, Mr. Constable, that is something else. You know what a man does talk about when you go to see these kind of women. We always talk business. That is the kind of business I always talk.

Q. Have you an idea how well you knew her, if so state it, so that we can judge of her mental condition?

A. I just knew her as well as I did you or Mr. Evans, and better than I knew you.

Q. And talked with her how often a week, on an average while she lived there closed to you?

A. Sometimes I was there and stayed all day with the old lady, when the boss was away; and I could not tell you how much talk we had because we were talking all the time.

Q. What did you talk about. .

A. We talked something about General Washington and Jackson and all these old fellows.

Q. With reference to her mind, what conversation did you have with her that would indicate to you the condition of her mind?

(Objected to by Mr. Whiteman, of counsel for defendant, as leading.)

LORE, C. J.:—We think that the question is admissible, that it is not leading.

\*     \*     \*     \*     \*     \*     \*

A. I have had conversations and talks here in Wilmington, but it would be impossible for me to tell.

Q. Have you had very many with her?

A. I have brought her things from Newark, fetched her things from the mill, and things like that.

\*     \*     \* .     \*     \*     \*     \*

*By Mr. Higgins:*

Q. You say you brought things in and out. Did you talk with her about what you went there for? Did you talk to her about bringing the things for her?

A. No, sir; she told me when I was going to Newark to stop, that she wanted some things from Newark; and my boss always told me—he was afraid of these folks—to go and do anything we could for them.

\*     \*     \*     \*     \*     \*     \*

Q. Did you have any conversations with her that caused you to have an opinion?

A. I have had a good many conversations. I could not answer that. I could not say that she was a woman that was right.

(*Mr. Whiteman,* of counsel for defendant, here objects to the witness giving an opinion on the facts stated.)

LORE, C. J.:—He cannot state any opinion, until you have all the facts he proposes to base it on. The jury are the judges of the value of his opinion, and whether the facts which he discloses before them would warrant any such opinion. That is our clear rule. He must state the facts, and after that he may then say whether from those facts he believes or not that she was of sound and disposing mind and memory. That has been the standing rule in our courts for fifty years, and there is no variation of that rule in this State, and the same must govern this case. He may speak of conversations, incidents and anything of that kind; there must be something upon which to base an opinion.

*Mr. Constable:*—I have some authorities here which I want to submit, showing that that rule has been enlarged upon in the Supreme Court of the United States and other courts, where it has been held sufficient if the witness has shown familiarity with the testator, even though he cannot recall any specific conversation.

LORE, C. J.:—Put your question; then we can pass upon it.

Q. From your intercourse with her, and your knowledge and intimacy with her, and conversations with her, and dealings with her, which you have detailed here on this witness stand; I ask you whether, in your opinion, she was of sound mind when you knew her?

(Objected to by Mr. Whiteman, of counsel for defendant).

*Mr. Constable:*—Before the Court will give him a right to

form an opinion, he must have shown intimacy with the person, giving him an opportunity to judge of the condition of the mind. When we have gone that far then the opinion is given for what it is worth. The other side can cross-examine and show the jury the worth of an opinion formed from that intercourse.

Although the person may not remember a conversation or a business transaction he had with the testator, still he might have had an intimate acquaintance with the person for years, and he should be allowed to give his opinion.

*Mutual Life Insurance Co. vs. Lathrop, 111 U. S. Supreme Court Reports, 612 (top paging), 536 (bottom paging); Crock vs. Davis, 81 Md., 151.*

*Mr. Whiteman,* replied, citing several Delaware decisions; among them the case of *Steele vs. Helm, 2 Marvel, 237.*

LORE, C. J. :—A majority of the Court think this question admissible.

(Exception noted for defendant.)

Q. From your intercouse with her and your knowledge and intimacy with her, and conversations with her, and dealings with her, which you have detailed here on this witness stand ; I ask you whether, in your opinion, she was of sound mind when you knew her ?

*Mr. Whiteman* again objected to the question on the ground of irrelevancy ; contending that the question should be directed to the time that she made the will.

LORE, C. J. :—Incapacity growing out of insanity or other cause may run back as far as you please, if you trace it up to the time of the will. You will have to bring it up to the time of making the will.

(Exception noted for defendant.)

A. Well, I never supposed she was; never thought she was.

*Alfred B. McVey*, the administrator of Caroline C. Pritchard, testified on behalf of defendant, that on the twenty-eighth of January 1896 he went to Caroline C. Pritchard's house pursuant to a message he received to that effect and talked with her about making her last will and testament, and that she instructed him as to what was her wish in making a final disposition of her property; that after receiving said instructions, he went to his home and dictated the will to his wife, according to the instructions received from Mrs. Pritchard, and on the same evening returned to Mrs. Pritchard's house and read a draft of the will twice carefully over to her, she following and making certain comments and inquiries, and that certain conversation took place at the time between himself and the testatrix; that the testatrix was then in bed and with the assistance of the witness appended her signature to the paper, which signature McVey witnessed and that Mrs. Pritchard acknowledged the said paper to be her last will and testament in the presence of Smith H. Rogers and Samuel Stewart the two attesting witnesses.

*Mr. Whiteman*, on behalf of the defendant, then asked the witness the following question:

Q. What in your opinion, was the condition of Caroline C. Pritchard's mind at the time that she affixed her signature to that paper writing?

*Mr. Higgins:*—Do you confine that to the regular question, based on the facts that he has testified to? If not, I object.

*Mr. Whiteman:*—No; he is an attesting witness?

LORE, C. J.:—We think he is an attesting witness.

A. I consider at that time her mind to be sound in every respect, and capable of making a will. Her mind and memory and understanding were surely clear and as I say, capable of transacting business or making a will.

*Albert Constable, Jr.*, a witness being produced on behalf of the plaintiff, in rebuttal, was sworn on his *voidire* at the request of Mr. Whiteman, and examined as follows:

*By Mr. Whiteman:*

Q. Where do you reside?
A. In Elkton, Maryland.
Q. What is your business?
A. I am a lawyer.
Q. You are a member of the Cecil County bar?
A. Yes, sir; and practice in the Maryland courts.
Q. What relation are you to Albert Constable, one of the counsel for the plaintiff in this case?
A. I am his son.
Q. Are you associated with him in the practice of law?
A. I am in his office. There is no partnership.
Q. One day last week your father held a telegram in his hand, during the progress of this trial, and stated to the Court that he had received a telegram from you to the effect that a certain witness could not be in attendance, and asked that he be allowed to examine the witness when he should appear here afterwards. Is it true that you sent him such a telegram?
A. What is that?
Q. He stated that he had received a telegram from you to the effect that a certain witness he desired could not attend that day; did you send him such a telegram?

(Objected to by Mr. Constable, of counsel for plaintiff, as irrelevant.)

*Mr. Whiteman* stated that he would connect the facts he was inquiring about directly with the matter of the competency of the witness. The witness was thereupon allowed to answer as follows:

A. I sent my father a telegram last week in connection with this case.

Q. In connection with what witness?

A. With Mr. Cole.

Q. Where does Mr. Cole live?

A. He lives at Pleasant Hill.

Q. Had you seen him that day?

A. Yes sir; the day I sent the telegram.

Q. Where did you see him?

A. At North East.

Q. Did you go there to see him?

A. I went down there that day to ask him if he could come that day to testify. My father was busy here, and asked me to see him and if he could come that day.

Q. You have inquired about some other witnesses to try to get them to come here to testify in this trial?

A. Yes, sir.

Q. Did you not see Joseph Egnor?

A. Yes, sir.

Q. About coming as a witness?

A. No, sir; not about coming here as a witness. He did not turn up here as a witness, and there was something said about his not being able to come, and I went to see him and I found him cleaning out his barn-yard.

Q. Did you not conduct the case in Belair?

A. I was in the cases the whole time they were in Maryland, but have not been connected with them since they have been out of that State. I am not in the case here.

Q. Have you inquired with respect to other witnesses besides Mr. Egnor and Mr. Cole?

A. I have inquired with respect to quite a lot of witnesses in the case, and I notified them to be here.

*By Mr. Higgins:*

Q. You have said you are not a counsel in this case, or in any of the litigation in the Delaware Court?

A. No, sir. There was a motion last summer here in this case, but I have taken no part as counsel in it since the spring of 1898 in Belair.

Q. That, as I understand, was the issue over there where Mr. McVey was one of the parties?

A. It was the case of John Pritchard, caveator, *vs.* Alfred B. McVey as executor.

Q. Have you examined any law for Mr. Albert Constable, Sr., in this case?

A. I don't think I have looked at any law in connection with the case since we tried the case in Belair in 1898.

Q. Why did he send to you about the witnesses?

A. He has been up here in this case, busily engaged in it, and he asked me to go up and notify them that they would have to be here. I have only been here myself one day besides to-day.

Q. It has been pretty cold weather, and you are younger than your father?

A. Yes, sir.

Q. I understand you to say that you are not a partner with your father?

A. No, sir; I am not.

*Mr. Whiteman,* upon the authority of *Wallace vs. the Wilmington and Northern R. R. Company, 8 Houston, 529,* objected to the competency of the witness to testify in the case, on the ground of being associated with the counsel in the case, and interested in the case; stating that he meant no reflection whatever upon the witness, but his objection was purely a legal one.

(After argument by the respective counsel, the Court rendered the following decision, sustaining the objection):

LORE, C. J.:—The Court will not draw any very nice lines, where a person is in the office of one of the counsel in the case and who takes part in the case.

We think under all the circumstances in this case, without reflecting upon anybody at all, that this witness cannot be examined.

(Exception noted for plaintiff.)

LORE, C. J., charging the jury:

Gentlemen of the jury:—This is an action of ejectment, in which you are to determine the title to certain lands and premises situated in this county, which are set out in the pretensions of the defendant, filed under the consent rule in this cause.

John Pritchard, the plaintiff, claims title to the said premises as the son and heir at law of one Caroline C. Pritchard, who died seized in fee simple of the premises in dispute. The defendant, Henry Henderson, claims title to the same premises as devisee under the will of the said Caroline C. Pritchard.

The plaintiff, John Pritchard, claims, not only that he is the son and heir at law of the said Caroline C. Pritchard, but also that the paper writing purporting to be her last will and testament, bearing date January 28, 1896, under which the defendant holds title, is void, because he alleges, that at the time of the execution thereof, the said Caroline C. Pritchard was not of sound and disposing mind and memory, and further, because she was unduly influenced therein by the said Henry Henderson.

In actions of ejectment, the plaintiff recovers, if at all, upon the strength of his own title, and not upon the weakness of the title of the defendant, if any there be.

To recover in this action, the plaintiff, John Pritchard, must prove to the satisfaction of the jury, by a preponderance of the evidence, that he is the legitimate son and heir at law of the said Caroline C. Pritchard. In addition thereto, he must in like manner further prove that the alleged will of Caroline C. Pritchard

under which the defendant claims, is void, either by reason of the
want of a sound and disposing mind and memory on the part of
the said Caroline C. Pritchard, or because of undue influence
exerted upon her at the time of the execution of the said will;
inasmuch as the formal execution and proof of the will are admitted
by the parties to this suit.

It is therefore essential for you to understand what, under the
law and decisions of this State, constitutes a sound and disposing
mind and memory; and also what amounts to undue influence.
The law upon these two points has been carefully summed up in
the recent case of *Ball, guardian, etc., vs. Kane, Executor, etc., 1
Pennewill, 90,* as follows :

" What constitutes a sound and disposing mind and memory
in a testator has been very clearly stated in the decisions of our
courts.

" In *Chandler vs. Ferris, 1 Harr., 454,* the Court say :
' When the testator was capable of exercising thought and judg-
ment and reflection, if he knew what he was about and had memory
and judgment,' he had testable capacity.

" In *Duffield vs. Morris' Ex'r., 2 Harr., 375,* the Court say :
' A sound mind is one wholly free from delusion, all the intellectual
faculties existing in a certain degree of vigor and harmony ; the
propensities, affections and passions being under subordination to
the will and judgment, the latter being the controlling power, with
a just perception of the natural connection or repugnancy of ideas.
Weak minds again only differ from strong ones in the extent and
power of their faculties; but unless they betray symptoms of a total
loss of understanding or of idiocy or of delusion they cannot prop-
erly be considered unsound.   A perfect capacity is usually tested
by this, that the individual talks and discourses rationally and sen-
sibly and is fully capable of any rational act requiring thought,
judgment and reflection.   This is the standard of a perfect capacity ;
but the question is not how well a man can talk or reason, or with
how much judgment he can act, or with how great propriety and sense

he can act; it is only: has he mind and reason? Can he talk rationally and sensibly? Or has he thought, judgment and reflection? Weakness of mind may exist in many different degrees without making a man intestable. Courts will not measure the extent of people's understandings or capacities if a man be legally *compos mentis.* Be be he wise or unwise, he is the disposer of his own property, and his will stands as the reason for his action.'

" In *Sutton vs. Sutton, 5 Harr., 459,* the Court say: ' Testable capacity amounts to nothing more than a knowledge of what he was about when he made the will, and how he was disposing of his property and the purpose so to do it.'

" In the *Lodge Will Case, 2 Houst., 418,* the language of the Court is: ' If the testator at the time of executing the will was capable of exercising thought, reflection and judgment, knew what he was doing, and how he was disposing of his property, and had sufficient memory and understanding to comprehend the nature and character of the transaction, he was capable of making a will. Mere weakness of mind or partial imbecility from disease of the body or from age will not render a person incapable of making a will.'

" In the *Jamison Will Case, 3 Houst., 108,* the Court say of the testator: ' If he is able to understand that he is disposing of his estate by will, and to whom he is disposing of it, however weak his intellect may be, he is able and competent to make a will.' Such, gentlemen, is testable capacity as defined in our reports.

" Every person is presumed in law to be of sound mind until the contrary is shown, and the burden of showing an unsound mind in the testator rests on the party contesting the validity of the will, and the testimony must relate to the time of its execution.'

" *Lodge's Will, 2 Houst., 418.*

" If, however, insanity is once clearly established, the burden shifts, and it devolves upon those supporting the will to show that insanity did not exist at the time the will was made; the burden, however does not shift until insanity is so established to your satisfaction by a preponderance of evidence.

"In determining the question of capacity, you must direct your minds to the precise time of the execution of the will. In cases like this, courts have been liberal in admitting testimony as to the physical and mental condition of the testator, both before and after the time of the execution of the will; but such testimony is admitted only for the purpose of enlightening your minds, so that you may have the environments of his life, and be able to concentrate your judgment upon that critical moment, and to say in that concentrated light whether at the precise time of the making of the will he was of sound and disposing mind and memory; if he was, then it is a matter of indifference what may have been his condition at any other time.   *   *   *   *

"When it is claimed that the will is void because of undue influence, the objection will not avail unless such influence amounted to a degree of restraint such as the testator was too weak to resist, such as deprived him of his free agency and prevented him from doing what he pleased with his property.

"*Duffield vs. Morris, 2 Harr., 375.*

"The degree of influence necessary to control the mind of the testator, must depend upon, and be proportioned to the mental and physical strength or weakness of the testator. It is obvious that a man mentally and physically weak is more susceptible to undue influence than one who is strong and healthy.

"The influence must be such as to take away his free will, such as he is too weak to resist, mere solicitation will not be sufficient to vitiate a will made by a person having a knowledge of what he is doing and intending to do it when making it, though his act may be brought about by solicitation or that kind of influence which a disposition to gratify another may produce.

"*Sutton vs. Sutton, 5 Harr., 459.*

"The test is this; is it the will of the testator or that of a person controlling his will which is expressed in the paper writing? Unless it is the substitution of the will of another for that of the testator, the influence or persuasion, whatever it may be, will not

vitiate a will. A testator may listen to the persuasion of a wife and children or others about him : may regard the ties of affection, and the will be valid, unless his mind and judgment were overborne and controlled by them in the making of the will. The mere fact that such persons are about and in the presence of the testator at the time the will was made does not of itself vitiate the will."

In reaching your verdict, you should give to the testimony of the subscribing witnesses to the will, such credit as their peculiar relation to, and opportunity of knowing the condition of the testator, at the exact time the will was made, entitle them. The law places them there to speak specially to that point. They, like expert witnesses, may give their opinion of the testamentary capacity of the testatrix, without giving the facts upon which such opinions are founded. Other than attesting and expert witnesses, must give the facts and circumstances upon which their opinions are based, and such facts and circumstances go to the jury with the opinion, so that the jury may judge from such facts and circumstances what such opinion is worth in each case.

You are to determine this case from the evidence given in this court room and the facts and circumstances here detailed. Nothing you have heard elsewhere, if anything there be; nothing said by counsel on either side which is not supported by that evidence, should have any weight whatever with you.

You are the exclusive judges of such evidence; where it conflicts, you are to reconcile it if you can. If you cannot reconcile it, you should be governed by the testimony of those witnesses, who have impressed you most, by their intelligence, impartiality, honesty and opportunities of knowing the truth.

Applying the rules of law as we have just stated them, to the facts in this case, you are to reach your verdict.

If you should find from the evidence, taking into consideration all the circumstances detailed and all reasonable inferences therefrom, that John Pritchard, the plaintiff, is the child and heir

at law of Caroline C. Pritchard ; and that in addition thereto, she was not of sound and disposing mind and memory at the time she executed the alleged will, or that she made the said will under the undue influence of the said Henry Henderson, as defined by the Court in this charge, your verdict should be for the plaintiff.

If he has not satisfied you that he is such child and heir, or that the paper writing is not the will of Caroline C. Pritchard, either from want of testable capacity, or because of undue influence or both ; your verdict should be for the defendant.

In other words, to entitled the plaintiff to a verdict you must be satisfied, both that John Pritchard is the heir at law of Caroline C. Pritchard, and that the paper writing is not her last will and testament.

(Exception noted for plaintiff).

Verdict: "We find that the defendant is guilty of the trespass and ejectment in the plaintiff's declaration mentioned."

## MOTION FOR NEW TRIAL.

The defendant in the above stated action by leave of the Court in that behalf by Charles B. Evans and J. Harvey Whiteman, his attorneys, files the following reasons why the verdict should be set aside and a new trial granted :

*First.* That the verdict was against the great weight of the evidence.

*Second.* That the verdict was against the law.

*Third.* That after the jury was empaneled and sworn and during the progress of the trial of the above cause, one of the plaintiff's counsel, to wit, Albert Constable, on several occasions conversed with one of the jurors, to wit, Richard L. Price, at the station

of the Philadalphia, Wilmington and Baltimore Railroad Company, in Wilmington, Delaware.

*Fourth.* That after the jury was empaneled and sworn in the above stated cause one of the plaintiff's counsel, to wit, Joshua Clayton, held a private conversation with one of the jurors, to wit, Samuel M. Harvey, in the office of the Court Stenographer in the County Court House.

*Fifth.* That after the jury were empaneled and sworn in the above stated cause one of the plaintiff's counsel, to wit, Joshua Clayton, was in company and conversation with two of the jurors, to wit, Frank Jester and Charles S. Bigger, in the saloon of Edward J. Newell, No. 6 East Seventh street, in the City of Wilmington.

*Sixth.* That after the jury were empaneled and sworn in the above stated cause the counsel of the plaintiff above named were in company and conversation with the said jurors and other of the jurors empaneled in said cause at other places during the progress of said trial.

*Seventh.* That in arguing the above stated cause before the jury, counsel for the plaintiff referred to offers of settlement; absence of witnesses who were beyond the jurisdiction of this Court; the condition of Caroline C. Pritchard the testatrix in respect to a physical disease; the act of one Walter Henderson, a witness not called at said trial; the findings of the juries in trials at law in the State of Maryland where the same issues between different parties were involved, and other statements upon which there was no evidence introduced in the trial of the above stated cause.

After hearing testimony and argument, the Court rendered the following opinion overruling the above motion.

LORE, C. J.:—One of the reasons urged for a new trial in this case is the rather unusual one in this Court, of the alleged miscon-

duct of certain counsel for the plaintiff, in holding private conversations with members of the jury, after they were sworn in the case and before the verdict was rendered.

In *Johnson vs. Porter, 2 Harr., 225,* the verdict was set aside because the defendant conversed with the jurors after they were sworn ; the conversation being *unexplained,* and the verdict being against the evidence.

In that case Chief Justice John M. Clayton used this language : "In any case where the verdict is strongly against the evidence, and this is accompanied by proof that the party in whose favor the jury have erred, has been seen in conversation with them, after they were sworn, and he does not promptly account for the conversation, we will set aside the verdict. He has no business with the jury, except in Court. He ought to keep away from them, and if he will place himself in suspicious circumstances, he must be prepared to clear himself from the suspicion or take the consequences."

We would approve and emphasize this doctrine, and say further that the doctrine applies to the counsel of the respective parties as well as to the parties themselves. If, therefore, the conversations which have been proved in this case were unexplained, the verdict for that reason would be set aside.

By consent of counsel in this case, the rules of evidence have been relaxed, the doors thrown wide open and all the conversations referred to have been detailed and explained, as having no relation to the case on trial ; both by counsel and the jurors implicated. As explained, they seem to have had no influence whatever upon the verdict. In such case, so far as we have been able to examine, the authorities are quite uniform that the verdict itself should not be disturbed, however imprudent such conduct might be. The rule being, that temporary association or conversation, between the jurors and counsel, which is satisfactorily explained, will not require the setting aside of the verdict, if it is shown to be of a non-prejudicial character ; as where there is no conversation in regard to the case on trial.

*Delany vs. Hartwig, 91 Wis., 412; Parsons vs. Johnson, 66 Iowa, 453; 17 A. and E. Ency. Law, 1214, (2d Ed.)* and cases cited.

We must not, however, pass over the fact, that one of the counsel, casually meeting, publicly treated two of the jurors in the case in one of the saloons of this city during the progress of the trial. Such conduct is most reprehensible, and we cannot too strongly condemn such an example of culpable imprudence and impropriety. Nothing but the full and detailed explanation of all the circumstances of this treating, made before this Court on oath, by the counsel, one of the jurors and by the saloon keeper, saves this verdict on this point.

There was sufficient conflict of testimony before the jury in this case from which reasonable men might draw different conclusions; and as the jury were the sole judges of the evidence, and as they were specially charged, not to regard any statement of counsel not supported by the evidence; and as there is nothing before us to show that any such statement in anywise affected the verdict, within the well settled practice of this Court the verdict should not be disturbed for such reasons.

We therefore refuse to order a new trial.

(Exception noted for defendant.)