## THE STATE OF UTAH, Respondent, v. CORNELIUS R. SNOWDEN, Appellant.

WITNESS—COMPETENCY—QUESTION FOR TRIAL COURT—PRIVILEGED COMMUNICATIONS—BURDEN OF PROOF—STATUTE, SEC. 3414, R. S. 1898—APPLIES TO NEGOTIATIONS FOR EMPLOYMENT—APPEARANCE OF RECORD—NOT NECESSARY TO CREATE RELATION OF ATTORNEY AND CLIENT—CRIMINAL PROCEDURE—ADULTERY—EVIDENCE OF SUBSEQUENT ASSOCIATION—ADMISSIBLE—RULE NOT IN VIOLATION OF RULE IN STATE v. HILBERG.

1. WITNESS: COMPETENCY: QUESTION FOR TRIAL COURT. When there is a conflict in the testimony as to the competency of a witness it is for the trial court to determine the question and an appellate court will not reverse the action of the trial court except upon being clearly convinced that a wrong conclusion was reached.

State v. Snowden,

2. PRIVILEGED COMMUNICATIONS: BURDEN OF PROOF. When it is sought to suppress evidence of statements of the accused, on the ground that they constitute privileged communications, the burden is on the party seeking to suppress the evidence, to show that it is within the terms of the statute, and it must appear that the witness learned the matter in question only as counsel or attorney for the party and not in any other way, and that it was received professionally and in the course of business.

3. STATUTE, SECTION 3414, R. S. 1898: APPLIES TO NEGOTIATIONS FOR EMPLOYMENT. The protection given by the statute, section 3414, Revised Statutes 1898, to privileged communications, applies to conversations with the attorney in negotiating to employ him.

4. APPEARANCE OF RECORD: NOT NECESSARY TO CREATE RELATION OF ATTORNEY AND CLIENT. When, upon the entire record, it appears that the relation of attorney and client existed and that in determining that the relation did not exist and in admitting the evidence, the trial court must have given undue importance to the fact that the attorney had not appeared of record for the defendant, the cause should be reversed and a new trial granted.

5. CRIMINAL PROCEDURE: ADULTERY: EVIDENCE OF SUBSEQUENT ASSOCIATION: ADMISSIBLE: RULE NOT IN VIOLATION OF RULE IN STATE V. HILBERG. In a prosecution for adultery, evidence of subsequent acts of association not amounting to crime are admissible as tending to show the probability of guilt in the crime charged and this rule is not in violation of the rule announced in State v. Hilberg, 22 Utah 27.

Decided March 29, 1901.

Appeal from the Third District Court, Salt Lake County.— *Hon. A. G. Norrell,* Judge.

Defendant was prosecuted for and convicted of the crime of adultery and appealed to the Supreme Court.

REVERSED.

*M. D. Lessenger, Esq.,* for appellant.

Our statute, excluding an attorney from being examined without the consent of his client in civil matters, applies also in criminal cases (Section 5011, Revised Statutes of Utah, 1898). "And the statute excluding the attorney from being examined as to any communication in the course of professional employment, should be fairly construed and applied according to the plain import of its terms. The statute is for the benefit of the client, not the attorney. To constitute professional employment it is not necessary that a retainer should have been paid, promised or charged for. The attorney is employed in his professional capacity when he is voluntarily listening to his client's preliminary statement or giving advice thereon, even though he should, after hearing such statement, decline to be retained further; or the client after hearing attorney's advice should decline to further employ him. The breach of professional relation between attorney and client, does not of itself remove the seal of silence from the lips of the attorney in respect to matters communicated in confidence. Denver Tramway Co. v. Owens, 36 Pac. Rep. 848; Meeks Atty's at Law, sec. 142; Foster v. Hall, 12 Pick. 89; Hunter v. Van Bomhorst, 1 Md. 504; Cross v. Riggins, 50 Mo. 335; (and the cases therein cited); Rex v. Brewer, 6 Car. & P. 363; 1 Greenleaf on Evidence, sec. 240; Bolton v. Cor. of Labor Bill, 6 Eng. Ch. 467; Robson v. Kemp, 5 Esp. 52; State v. Dawson, 90 Mo. 149; Kaunt v. Kessler, 114 Pa. St. 603; 1 Whart. Ev., 581; Carpmeal v. Powise, 1 Phil. 687; Weston v. Commonwealth, 111 Pa. St. 251.

*Hon. M. A. Breeden,* Attorney-General and *W. R. White,. Esq.,* Deputy Attorney-General, for respondent.

Much adverse comment is made by appellant about the testimony of V. Rapp being introduced. It will be seen in

reading the testimony in the bill of exceptions, that Mr. Rapp squarely denied that he was an attorney for the defendant at any time in this case. On the contrary, it was certain that Rapp was an attorney against him in the divorce case. The court heard the testimony of Rapp on his examination as to his competency; also the statement of the defendant, and decided that Rapp was competent. It was a matter of discretion with the trial court, and there does not seem to be any evidence of abuse of discretion. A trial judge is always better qualified to judge of such matters than the appellate court, because he sees the conduct of all the parties and witnesses.

## STATEMENT OF FACTS.

Defendant was tried for the crime of adultery alleged to have been committed in Salt Lake county on October 2, 1899, with one Audrey Keeler, an unmarried woman, the defendant being a married man. Defendant was convicted and sentenced to three years' imprisonment. A motion for new trial was duly made upon the ground of errors of law occurring at the trial, and upon newly-discovered evidence. This motion was denied and the defendant appeals to this court assigning error particularly in the admission of incompetent testimony. A witness, V. Rapp, an attorney at law, was permitted, against the objection of defendant, to testify to certain conversations with the defendant. The contention is that these conversations were privileged under section 3414, Revised Statutes of Utah, 1898, as being communications between attorney and client in the course of professional employment. The question is, did the relation of attorney and client exist, and were the communications made in the course of professional employment? The testimony of this attorney shows

that he had known the defendant, Snowden, since 1889; that their relations were friendly, and that during that time he had done some business for the defendant; that at the time of the arrest, both lived at Richfield, Utah; that Rapp was then defendant's attorney in a certain attachment suit; that said attorney came to Salt Lake at the time of the preliminary examination and attended the same; that in the evening of that day he, in company with Mr. Lessenger, defendant's attorney upon the trial in the district court and in this court, went to visit the defendant in the county jail, and that the defendant talked to both attorneys about his criminal case, mentioning certain incidents thereof; that Rapp left a note on Snowden's door in Richfield requesting if any one called for Snowden to call at Rapp's office. The following are extracts from the testimony of the same witness upon cross-examination:

"Q. What did you go down to the jail for? A. I think I went down there with you. Q. What for? A. To see him and talk with him. I knew him. Q. Went down to see him what about? A. I don't know that I had any idea in view when we went down there. Q. You said you were going down, and I told you I was going down, and you and I went down together? A. I remember we went down together. Just the purpose in going down I don't know. Q. How long did we talk there in the cell? A. I don't know. We may have been in there half an hour or more—some little time we were in there. Q. Did you hear Mr. Snowden say to you and me when we were sitting on two chairs in the cell and Mr. Snowden was sitting on the lounge or stretcher, that he wanted you and me to try his case—to attend to it for him? A. No, he didn't say that. Q. What did he say about that? A. He said he was going to try to get rid of the two attorneys that he had, and employ us if he did get rid of them. Q. If he got rid of the two attorneys? Whom did he mean?

State v. Snowden,

A.   He meant Mr. Brown and Mr. Potter.   Q.   You talked with him confidentially in the cell yourself, didn't you?   A. I don't remember talking with him confidentially in the cell. Q.   Alone?   The door was open, and I stepped out in the corridor and you went back and talked with him?   A.   I think so—yes.   I think I remember it now.   Q.   And you talked about his case.   A.   About his case.   Q.   He knew you were an attorney?   A.   I suppose so.   Q.   You talked about the merits of this case in the cell?   A.   We didn't discuss the merits of this case in the cell or any other place in the jail.   Q.   How did you come to come to Salt Lake City?   A. Miss Keeler asked me to come up.   Q.   At the preliminary hearing?   A.   For her.   Q.   Didn't you get a letter from one of Mr. Snowden's attorneys to come up here?   A.   Yes, sir.   Q.   That is what brought you here, was it?   A.   No, sir; that is what took me down to see Miss Keeler.   Q.   You heard Miss Keeler testify at the preliminary hearing that she hadn't employed you?

"Objection made and sustained, and an exception taken.

"Q.   Do you remember asking me if I got a retainer? A.   Yes, sir.   Objection made and sustained, and exception taken.   Q.   Did you state that you hadn't got your retainer yet?   A.   I don't remember of stating that.   I didn't get it.   I didn't get any retainer."

Bearing upon the same question, defendant testified, in substance, that on the evening of the arrest, he called to see Mr. Rapp, but was unable to do so; that he afterwards, and before the preliminary examination wrote Rapp that he wanted to employ him in the trial of his case and to come to Salt Lake City; that Rapp afterwards spoke about receiving the letter; that he, the defendant, had three conversations in the county jail with Rapp, once in the presence of attorney Lessenger, and twice in the presence of attorney Brown; that he consulted

Rapp, as an attorney, about the case at bar, and the proofs and defense therein and received advice thereon; that he told Rapp he wanted to employ him to look after his interests in this cause, and that he paid Rapp $24 or $25, as services in this cause, which included $8, the attorney's expenses to Salt Lake City to attend the preliminary examination; that Rapp advised him to fight the case as far as he could go; that Rapp often came to defendant's dental office in Richfield after the preliminary examination to talk to defendant; that a bill of sale was given Rapp for seven horses, three wagons, office outfit and personal property, the consideration named being for legal services and other considerations, which property was held by the attorney for a time and afterwards turned back to defendant.

Mr. Lessenger testified that he consulted with Rapp and Snowden at the preliminary hearing; that Rapp said he was going to appear for the girl, to defend her, at Snowden's instance; that after the hearing he, Lessenger, went with Rapp to the jail and there talked confidentially with defendant so that no one else would hear; that Rapp was present and they talked solely about the merits of the case; that Snowden said he wanted Rapp and Lessenger to represent him in the trial in the district court; "and I think Mr. Rapp said that he and I would take the case; and we consulted about the testimony that had been given in. Then I went outside the cell and asked Mr. Rapp if he had got his fee, his retainer; he said no, he hadn't; he said Snowden hadn't any money; he asked me if I had received mine; I told him I had previously received some as a retainer. I left the jail and left Mr. Rapp in consultation with Snowden in the cell. * * * We went in there for the purpose of having a consultation, private and confidential; and I considered myself employed under the same circumstances."

Upon being recalled Mr. Rapp denied the receipt of the money testified to by Snowden, except $8, which witness says was paid on the attachment suit and not upon the criminal case. The witness further testified that he did not consider the conversation a professional communication, but that no change in their relations had occurred between the visit to the county jail and the time of the communication in question.

The affidavit of M. L. Brown, on motion for new trial, is in substance, that affiant was attorney for defendant at the preliminary hearing, and that Rapp was also; that they together with C. B. Potter, senior counsel, held frequent consultations with defendant touching his defense and that Rapp was recognized as counsel and given the facts of the defense; that after the hearing Rapp requested affiant to go with him to the county jail to get defendant to secure payment of fees then due for services as his attorney at the preliminary hearing; that while at the jail Rapp drew some kind of document which both he and Snowden told affiant was for the purpose of securing the said Rapp said fee, and requested affiant to witness same, which he did; that affiant at all times while he was of counsel recognized Rapp as co-counsel and consulted and advised with him as such; that affiant is not now of counsel in said case, and has no interest in the same.

The trial court overruled defendant's objections and admitted the communication claimed to be privileged, which was to the effect that Snowden told Rapp in defendant's dental office at Richfield, after the preliminary hearing that he, defendant, had been intimate with the said Audrey Keeler, but not upon the date alleged; "that they had got the wrong night. He said that he had had intimate relations with her in and around Richfield, and he had sent her up ahead of him to Salt Lake, or had had her go to Salt Lake; that he went up later

State v. Snowden,

to meet her and found her rooming with a Mrs. Kimball or Lawrence * * * that he took her from there over to the Midgley block and had been there a night or two when he was discovered by Mrs. Cody and this Kimball woman."

HART, D. J. (After stating the foregoing facts)—Our inquiry in this case is not whether the defendant be guilty or innocent; the question is whether upon the record before. this court there was such error in the admission of testimony, and duly excepted to, as precluded the defendant from having a fair and impartial trial.

There being a conflict in the testimony as to the competency of the witness, it was for the trial court to determine the question—Harris v. Dougherty (Tex.), 11 S. W. 921, and cases cited; and this court should not reverse except upon being clearly convinced that the court reached a wrong conclusion. Neither should it be overlooked that "the burden is upon the party seeking to suppress the evidence to show that it is within the terms of the statute"'(Weeks, Attys., sec. 147); and that "it must appear that the witness learned the matter in question only as counsel or attorney or solicitor for the party, and not in any other way, and that it was received professionally and in the course of business." Sharon v. Sharon (Cal.), 22 Pac. 26, and cases there cited at page 39. In the same case it is also said: "The communication must be confidential and so regarded, at least by the client at the time. The presumption is that all communications between attorney and client in the course of professional employment are confidential," citing Hager v. Shindler, 29 Cal. 63.

In the case of Chirac v. Reinicker, 11 Wheat. 280, the court says: "The privilege, indeed, is not that of the attorney, but of the client; and it is indispensable for the purpose of private justice. Whatever facts, therefore, are communi-

cated by client to counsel, ᵴᵤlely on account of that relation, such counsel are not at liberty, even if they wish, to disclose; and the law holds their testimony incompetent."

In the late case of Bruley v. Garvin (Wis.), 81 N. W. 1038, it is held not to be "absolutely essential that a fee should. be paid or that there should be an actual retainer;" and that it is sufficient if the attorney's legal advice was sought for, and he could be considered, for the time being, the legal adviser of the other. Supporting the same rule is Jones on Evi., sec. 767, and cases cited.

The protection of the statute applies to conversations with the attorney in negotiating to employ him. It may be necessary to disclose to the attorney many confidential matters connected with the case before it is determined whether a retainer will be given or accepted. Of course a different rule would apply to communications made to the attorney after he had informed the person that no employment would or could be accepted. Nelson v. Becker (Neb.), 48 N. W. 962, cited with approval in Farley v. Peebles (Neb.), 70 N. W. 231.

In Baco v. Frisbie, 80 N. Y. 394, the attorney divided his attentions between the bar of justice and the bar of Bacchus. While presiding at the latter place, a former client, in the presence of several others, but perhaps not in their hearing, submitted a hypothetical proposition to the attorney at the bar. No fee was paid, neither was a suit pending nor contemplated. In a suit afterwards brought between third parties, the court held the saloon conversation privileged, because it appeared from all the facts that it was a confidential communication in the course of professional employment. It is there said: "All communications made by a client to his counsel for the purpose of professional advice or assistance are privileged, whether they relate to a suit pending or contemplated, or to any other matter proper for such advice or aid." Citing

Britton v. Lorenz, 45 N. Y. 51; Turquand v. Knight, 2 M. & W. 98. See also, Williams v. Fitch, 18 N. Y. 551; Bank of Utica v. Mersereau, 3 Barb. Ch. 595; Greenl. Ev. (15 Ed.), sec. 240.

The underlying principle of the rule, as stated in the New York case first above cited, is "that he who seeks aid or advice from a lawyer ought to be altogether free from the dread that his secrets will be uncovered, to the end that he may speak freely and fully all that is on his mind."

In 19 Ves. 267, Lord Eldon expressed the thought that one way of preventing an attorney, who had changed his relations with his client, from testifying against his client "would be by striking him off the roll." The following quotations in State v. Dawson (Mo.), 1 S. W. 829, from the opinions of Lord Brougham, illustrate the importance and purpose of the rule: "The foundation of this rule is not on account of any particular importance which the law attributes to the business of the legal professors, or any particular disposition to afford them protection; but it is out of regard to the interests of justice, which can not be upholden, and to the administration of justice, which can not go on, without the aid of men skilled in jurisprudence, in the practice of the courts, and in matter affecting rights and obligations which form the subject of all judicial proceedings." Greenough v. Gaskell, 7 Eng. Ch. 98. "If such communications are not protected, no man would dare consult a professional adviser with a view to his defense, or to the enforcement of his rights; and no man could safely come into court, either to obtain redress or to defend himself." Bolton v. Liverpool, 6 Eng. Ch. 467.

It is evident from an inspection of the record, that the trial court attached much importance to the question of whether there was an absolute contract of employment. The trial court conceded, in fact, that a conditional employment was proved

and that the appearance for Miss Keeler was upon the employment of the defendant. Undue importance seems to have been attached to the fact that the attorney had not appeared of record for the defendant. Greater weight seems to have been given to the opinion of the attorney that the conversation with him was not in professional confidence than to all the surrounding circumstances showing that such must have been the case. Upon the entire record, if not alone upon the undisputed facts as testified to by the attorney, it is evident that such relations existed between the attorney and defendant as to make the communication in question privileged. The conclusion upon all the testimony is irresistible that a close confidence existed between the parties and that the defendant made the statement in confidence to a person whom he regarded, and had reason to regard, as his attorney in the case at bar. In support hereof, also see: Denver Tramway Co. v. Owens, 36 Pac. 848; Davis v. Morgan (Mont.), 47 Pac. 793; Moore v. Beay, 10 Pa. St. 519; Benedict v. State (Ohio), 11 N. E. 125; Basye v. State (Neb.), 63 N. W. 811; State v. Perry (Id.), 38 Pac. 655 (dissenting opinion).

Another communication between the same persons at a later time and in reference to a divorce suit against defendant, is also claimed to be privileged. The facts are that Mrs. Snowden, by her attorney, Mr. Rapp, presented to her husband, the defendant, a complaint in divorce accusing him of adultery in October, 1899, with the said Audrey Keeler, and asking a divorce upon that ground. The attorney was called to testify that he presented the complaint to defendant and that defendant signed a document, in substance, that he had received a copy of the said complaint in divorce and knew the contents thereof, and waived service of summons and time in which to answer or otherwise plead, and consented to trial upon the

complaint without answer or other pleading thereto by the defendant.

Whatever may have been the relations of the attorney and defendant at other times and in reference to other matters, it is evident that as to the divorce case the attorney was representing Mrs. Snowden and not the defendant. So far as the record discloses, there were no confidential relations existing between Rapp and Snowden as to the divorce case. In fact, no such claim is made. They were dealing at arm's length and the voluntary appearance signed was a public record and doubtless could have been proved by any one acquainted with the defendant's signature. The relation of attorney and client may exist for one case and not for another. Brigham v. McDowell (Neb.), 27 N. W. 385; Clay v. Tyson (Neb.)', 26 N. W. 240; Plano Mfg. Co. v. Frawley (Wis.), 32 N. W. 768; Tucker v. Finch (Wis.), 27 N. W. 817.

There was no error in the admission of the divorce complaint of the wife, and the voluntary appearance and consent to default thereon by the defendant. The complaint was not admitted as original evidence of the truth of the facts therein sworn to, but simply as a necessary incident explaining and characterizing the nature of defendant's acquiescence or confession. "Admissions and confessions may be implied from the acquiescence of the party in the statements of others made in his presence, when the circumstances are such as afford an opportunity to act or speak, and would naturally call for some action or reply from men similarly situated. 1 Greenl. Ev., secs. 197, 215; Joy on Confessions, 77. And it makes no difference that the statements which call for a reply are made by a party who is incompetent to testify." People v. McCrea, 32 Cal. 100. Supporting the same doctrine, see Com. v. Trefethen (Mass.), 31 N. E. 967; 1 Bish. Cr. Proc., sec. 1254; 3 Am. & Eng. Ency. Law (1 Ed.), 492; Roscoe's Cr. Ev. (7 Ed.),

State v. Snowden,

p. 54; People v. Ah Yute, 54 Cal. 89; Kelly v. People, 55 N. Y. 565; Wharton's Cr. Ev. (8 Ed.), sec. 679.

The prosecution was permitted, over the objection of the defense, to introduce testimony of the association of defendant with Miss Keeler after the date of the offense alleged. The evidence shows that the defendant walked and drove out with Miss Keeler before and after the birth of her child; that before the child was born defendant rented a room at her home, and at the time of her sickness in childbirth was sent after the doctor. All these acts of association were proper to be shown as bearing upon the defendant's guilt as charged. This is not in violation of the rule laid down by the majority opinion of this court in the case of the State v. Hilberg, 22 Utah 27, 61 Pac. 215, which denies the right in the State to prove acts of sexual intercourse occurring subsequently to the act charged and relied upon. In the one case a separate and distinct crime is sought to be shown as occurring subsequently to the crime alleged. In the other case, subsequent acts of association not amounting to crime are admitted in evidence as tending to show the probability of the guilt charged. As the child was born in January, 1900, such proof of association would tend to show defendant's paternity of the child, an offense which must have been committed prior to the crime charged.

Let the order enter, remanding this case with instructions to the trial court to set aside the verdict and judgment and grant a new trial to the defendant. *Baskin* and *Bartch, JJ.,* concur.