THE REAL ESTATE TRUST COMPANY OF PHILADELPHIA, Trustee,

*vs.*

WILMINGTON AND NEW CASTLE ELECTRIC RAILWAY COMPANY, WILMINGTON, NEW CASTLE AND SOUTHERN RAILWAY COMPANY, SECURITY TRUST AND SAFE DEPOSIT COMPANY, Trustee, AND THE NATIONAL BANK OF WILMINGTON AND BRANDYWINE.

*New Castle, Sept. 29, 1910.*

A provision, in a corporate mortgage to secure bonds, that written notice must be delivered to the president, secretary and treasurer of the corporation at its prinicpal office to make overdue payments within thirty days, as a condition precedent to foreclosure, is complied with where the president, secretary and treasurer in fact received the notice, though it was not delivered to them at the princiapl office of the corporation

where the corporation had consolidated with another corporation, and so had no principal office.

The solicitor of one party to a case is a competent witness to prove an admission by the adverse party.

The solicitor for the complainant is a competent witness to prove service of a notice on the defendant, constituting a condition precedent to the right to sue.

To constitute usury, there must in fact be a loan of money or its equivalent; and a transaction which is apparently a sale or exchange is not a loan, unless such was the intention of the parties, or the transaction was a loan under cover of sale or exchange.

A railway company, authorized to borrow money to complete and equip its road and secure the same by mortgage, employed the lowest bidder to build and equip the road. The bidder was paid for the work, from time to time, in the mortgage bonds of the company. The bonds were certified in accordance with a resolution of the directors of the company, and were wholly used for the building of the road, the transaction being in good faith; but the cost of the work was less than the face of the bonds. *Held*, that the bonds and mortgage were not tainted with usury; the transaction not being a loan under cover of a contract to build the road in consideration of the bonds.

Evidence *held* not to show that bonds issued by a railway company to a contractor to build and equip the road were fraudulent and unenforceable.

Evidence *held* to show that a holder of bonds issued by a railway company to a contractor to build and equip the road received them in due course of business, without notice of any defect, usury, fraud, or illegality, entitling him to enforce them.

On mortgage foreclosure against an electric railway company, the holders of bonds are entitled to claim for their face value, in spite of equities between the original parties, where the bonds were such as pass by delivery.

Mortgage foreclosure proceedings against an electric railway company should not be referred to a master to ascertain the extent of any prior liens, where the mortgage foreclosed is the first lien, with the possible exception of unpaid taxes, and where the property belongs to a single company, and no uncertainty concerning any of the property appears, excepting as to one car.

The terms of sale on foreclosure of a mortgage against a railway company should be reasonable and of such character as to encourage bidding; but there should be some requirement evidencing the good faith of the bidder, as well as to secure payment of the costs.

The bidder at a mortgage foreclosure sale against a railway company should be required to make a deposit to evidence his good faith, but should not be required to make it twenty-four hours in advance of the sale; any time before the sale being sufficient.

In ordering a mortgage foreclosure sale against a railway company it is proper to direct that the deposit required of the successful bidder may be made in bonds, to which the proceeds of the sale would have to be applied.

It is no objection to a decree of mortgage foreclosure against a railroad company that no minimum price at which the property can be sold is fixed, since the Court can determine when the sale is returned whether the price is adequate.

The time allowed for redemption under mortgage foreclosure against a railroad company should be reasonable, depending on the facts and circumstances of the particular case.

One month is a reasonable time for redemption under mortgage foreclosure against a street railway company, where the company had several months in which to redeem after notice of default was given and before the suit to foreclose, and three years after suit and before foreclosure.

While the Court of Chancery probably has power to appoint a master to make a sale in foreclosure, the Sheriff will be ordered to make it, in compliance with the general statute respecting sales in that Court.

BILL TO FORECLOSE CORPORATE MORTGAGE. On May 23rd, 1907, receivers were appointed for the Wilmington, New Castle and Southern Railway Company, and thereafter, by leave of the Chancellor, the complainant filed this bill to foreclose a certain mortgage executed by the Wilmington and New Castle Electric Railway Company prior to its consolidation with the New Castle and Delaware City Railway Company into the Wilmington, New Castle and Southern Railway Company. The allegations of the bill and answer and the contentions of counsel are sufficiently stated in the opinion of the Chief Jus-

tice, before whom the cause was argued on bill, answer, testimony and exhibits; the Chancellor having been disqualified to hear the same by reason of his interest therein as ccunsel for one of the defendants prior to his appointment as Chancellor.

*Herbert H. Ward* and *Joseph deF. Junkin* (the latter of the Philadelphia Bar), solicitors for the complainant.

*T. Bayard Heisel*, solicitor for Wilmington, New Castle and Southern Railway Company:

*Benjamin Nields*, solicitor for Security Trust and Safe Deposit Company.

*William T. Lynam*, solicitor for The National Bank of Wilmington and Brandywine.

THE CHIEF JUSTICE: The Real Estate Trust Company of Philadelphia, trustee named under a certain indenture of mortgage, dated August 1st, 1896, executed by the Wilmington & New Castle Electric Railway Company, in favor of said trust company, presented to the Chancellor of this State on July 1st, 1907, a petition which contained, *inter alia*, the follcwing averments:

"1. By indenture of mortgage, dated August 1st, 1896 the 'Wilmington and New Castle Electric Railway Company,' a corporation of the State of Delaware, granted and conveyed to your petitioner all the railways of the said railway company, beginning on the Wilmington and New Castle public road 100 feet south cf where the tracks of the Wilmington & Northern Railroad Company cross said public road in New Castle Hundred, thence extending over various public roads, lands, and streets, as therein described, in the County of New Castle and State of Delaware, together with the equipment and rolling stock of such railway, and together with the other rights, privileges and franchises therein described and conveyed, to sccure the payment of an issue of bonds of said railway company in the aggregate amount of one hundred and fifty thousand dollars ($150,000), payable on August 1st, 1926, with interest thereon at five *per cent. per annum*, payable semi-annually, all of which bonds were duly issued by said railway company, and

duly certified by your petitioner as such trustee, and are all now outstanding.

"2. Upon April 2nd, 1904, under proceedings duly had according to the laws of the State of Delaware, and in pursuance of an agreement of merger, dated February 15th, 1904, the said 'The Wilmington & New Castle Electric Railway Company' and a corporation known as 'New Castle & Delaware City Railway Company' became merged as one corporation under the name of 'Wilmington, New Castle & Southern Railway Company'; such agreement, and the proceedings effecting such merger, however, expressly preserving unimpaired all liens on the properties of either of said corporations, and providing that the component corporations should be deemed as continued in existence to preserve the same, and which proceedings preserved unimpaired the lien of the mortgage aforesaid, of which your petitioner is the trustee.

"3. Upon May 23rd, 1907, in the above entitled cause, on application of a general creditor of the said 'Wilmington, New Castle & Southern Railway Company,' your Honorable Court appointed Wilmer Palmer and J. Chester Gibson receivers of the said 'Wilmington, New Castle & Southern Railway Company'; and such receivers are now in possession of said property of the said railway companies, which so became merged as aforesaid.

"4. On August 1st, 1901, default was made by the 'Wilmington & New Castle Electric Railway Company' in making payment to petitioner of the two thousand dollars ($2,000) covenanted to be paid by it to the sinking fund, as provided by the said mortgage, and since said date, on each successive August, 1st, 1902, 1903, 1904, 1905 and 1906, similar default was made, and which has been persisted in until the present time.

"5. On August 1st, 1906, default was made in the payment of all the coupons which matured upon such bonds on that date, and such default has been persisted in until the present time.

"6. By a paper writing, dated November, 1906, and duly delivered to petitioner, the holders of more than 25 per cent. of all of the said bonds then outstanding notified peti-

tioner of these defaults, and requested it, as provided by said mortgage, to notify the railway company by written notice that the sinking fund payments and overdue interest must be paid within thirty days succeeding the date of notice, otherwise the trustee would proceed to institute the proper proceedings at law or in equity for the protection and enforcement of the rights and remedies of the holders of the bonds secured by said mortgage, and requesting petitioner, if such notice was not complied with, to proceed to enforce the proper proceedings at law or in equity for their protection. Due written notice of this request was served upon the officers of both the 'Wilmington & New Castle Electric Railway Company' and the 'Wilmington, New Castle & Southern Railway Company,' on the 5th, 6th, 7th and 8th days of March, 1907, demanding and requiring from said companies that, unless said sinking fund payments and interest so overdue were paid within thirty days from the date of the said notice, petitioner would proceed to institute proper proceedings at law or in equity for the protection and enforcement of the rights and remedies of the holders of the bonds secured by the said mortgage.

"7. Said payments were not made within thirty days from the dates of the service of the notices, and more than ninety days have expired since the dates of the service of the aforesaid notices upon the defendant corporations as aforesaid, and by the terms of the said mortgage, under the aforesaid request to it by the said bondholders, your petitioner has now the right and it has become its duty to proceed to protect and enforce the rights of the holders of the said bonds, and to proceed to collect the same with interest accrued thereon out of the said property, in accordance with the request made to it by the said bondholders under the terms of the said mortgage."

Upon such showing the petitioner claimed it to be its duty as trustee to proceed to comply with the request to take proceedings to foreclose the said mortgage, and collect from the property embraced therein the amounts due upon the said bonds; and inasmuch as the possession of the mortgaged property was in the hands of receivers appointed by the Court, the trustee prayed leave to file its bill of foreclosure in the cause.

Leave was granted the trustee to file its bill of foreclosure which embraced the foregoing averments taken from the petition, and the case is now before the Court for determination upon bill, answers and the proofs taken.

The foreclosure of said mortgage is opposed on two grounds:

(1) Because the trustee did not, before instituting suit to foreclose the mortgage, notify the said Wilmington & New Castle Electric Railway Company, by written notice delivered to the president, secretary and treaurer thereof, at the principal office of said company, to pay the sinking fund payments and overdue interest within thirty days, as required by the terms and provisions of said mortgage as a condition precedent to the foreclosure of the same.

(2) Because the bonds issued, to secure which the mortgage in suit was executed, were and are usurious and void, and a court of equity will not enforce their collection by directing a foreclosure of the mortgage.

With respect to the first ground it is contended by the respondents that the trustee failed to give the notice required (a) in that it was not delivered to the president, secretary and treasurer at the principal office of the company, and (b) in that it is not shown by competent evidence that it was delivered to the secretary of the company at any place or time; it being insisted that the testimony of H. H. Ward, Esq., who testified that he served the notice, should be stricken out and disregarded.

I do not think very much insistence was placed upon the point that the notice was not served or delivered at the principal office of the company. The important thing, of course, was that the three officers named should have the notice required by the mortgage to be given; and it is a fair construction of such provisions to hold that if it is shown that the president, secretary and treasurer of the company did in fact receive such notice, even though it was not delivered to them at the principal office of the company, the requirement of the mortgage has been substantially complied with. To hold otherwise would be unreasonable and entirely too technical.

As a matter of fact there was no such office after the consolidation of the two companies above mentioned, at which it was at all practicable to make the service. It appears from the evidence before me, and is in fact admitted, that the required notice was served upon the president and treasurer, although not at the principal office of the company. There can be no doubt, therefore, that as to those officers there was a substantial compliance with the terms of the mortgage, and the notice as to them was legal and binding.

It is, however, argued with apparently much confidence, in behalf of the respondents, that it is not shown that a proper and legal notice was delivered to the secretary of the company, because H. H. Ward, Esq., who delivered the notice to such officer, was, at the time he gave his testimony, counsel for the complainant, and therefore incompetent to testify in the cause. It is admitted that no notice was delivered to the secretary other than that which was served by Mr. Ward, and this Court must, therefore, determine whether he was a competent witness to prove the delivery of such notice.

The cases of *Wallace v. W. & N. R. R. Co.*, 8 *Houst.* 529, 18 *Atl.* 818, and *Pritchard v. Henderson*, 3 *Pennewill* 128, 50 *Atl.* 217, have been cited by the respondents in support of the proposition that "our courts have declared it to be the public policy of this State that counsel for parties, and those connected with them, shall not be witnesses in a case." There have been other cases, besides the two mentioned, in which our courts have passed upon the competency of counsel as witnesses, and of those connected with them in the preparation of the case. The earliest case is that of *Johnson v. Farmers' Bank*, 1 *Harr.* 118, in which the Court held that the communication made to the attorney was not privileged, and that he might be sworn. In the case of *Andrews v. Thompson*, 1 *Houst.* 522, an attorney was held incompetent to testify who had been of counsel for the plaintiff in the rule at the time of the reference of the suit out of Court, and in the trial of it before the referees, but who had afterwards, by leave of the Court, withdrawn from the case. The Court refused his testimony as to any fact which came to his knowledge during his connection with the case as the

attorney of one of the parties. In the case of *Solomon v. Loper, et al.*, 4 *Harr.* 187, the attorney for the plaintiff was called to prove a certain admission made by the defendant respecting the amount of a note which had been lost. The attorney was objected to as a witness; but the Court decided that the objection was to his credit, and not to his competency. And the Court in *Gilpin v. Marley*, 4 *Houst.* 284, decided that an attorney was incompetent to testify who said he had no knowledge or information in regard to the note in question, except such as had been communicated to him in his professional capacity.

The reason for the rule which excluded counsel in the cause from testifying was very clearly expressed by Chief Justice Gilpin in the case of *Bush v. McComb*, 2 *Houst.* 546. T. F. Bayard, Esq., was called and sworn as a witness on behalf of the plaintiff, and stated that he had been of counsel for the parties, who were co-administrators, and had frequently been consulted by each of them in regard to their business previous to the settlement of the estate. During his examination he was asked what statement or declaration had been made to him by the defendant on a certain occasion referred to, after the settlement of the estate and he had ceased to be counsel for either of the parties, in regard to the matter in litigation between him and the plaintiff. Objection being made, Chief Justice Gilpin said:

"Since the case cited from 1 *Harr.* 118, the principle of exclusion in such cases had been more distinctly ruled and established than it was at that time. The rule in regard to it, as now understood and established both in this country and England, is based, not so much on the ground of privilege to either the counsel or the client, as on the ground of the danger and impolicy of allowing the confidential communications of any one to his professional adviser to be disclosed and made public, even for the purpose of the administration of justice; and the object of it seems plainly to require that the entire professional intercourse between attorney and client, whatever it may have been, shall be protected by profound secrecy; and this protection, given by the Court to such communications, does not cease with the termination of the suit, or other business in which they were made; nor is it affected by the party's ceasing to employ such attorney and retaining another; nor by

any other change of relations between them; nor by the death of the client. The seal of the law once fixed upon them remains forever, unless removed by the party himself in whose favor it was there placed. 1 Greenleaf on Evidence, §§ 240, 243."

This case was followed by *Crooks v. Purnell*, 4 *Houst*. 305, in which it was held that the rule of exclusion did not apply, because the communication sought to be shown was not a confidential one. This was an action of assumpsit for money had and received. During the progress of the case Mr. Cullen called Mr. Moore, who was associated with him as attorney for the plaintiff, to prove a demand made by him as such upon the defendant. Objection being made, the Court said:

"The fact proposed to be proved by Mr. Moore does not partake in any degree of the character of a confidential communication between counsel and client, which it is the policy of the law to regard as such and to prevent him from disclosing it. On the contrary, as a communication merely, it was made to him by the other party in the suit. It was, however, rather an act done or a step taken in the cause by the counsel for the plaintiff than a communication to any one of any fact, knowledge, or information in relation to it. Besides, it might in practice be attended with some unnecessary inconvenience to hold that an attorney in a cause is an incompetent witness to prove a demand and refusal merely, whilst there is nothing in the reason of the rule referred to which requires that the seal of secrecy and confidence should be imposed upon it."

It appears, therefore, that up to, and including, the decision last mentioned, the rule excluding counsel as witnesses was based upon the confidential character of the communication sought to be proved. But in two more recent cases our Court has apparently enlarged the rule to the extent of excluding counsel in the cause, or any attorney, or student at law, who was associated with counsel, or had assisted him in the preparation of the case. Such exclusion seems to have been based upon what were conceived to be grounds of public policy, and does not appear to be confined to confidential communications. In the first of the two cases referred to, *Wallace v. W. & N. R. R. Co.*, 8 *Houst*. 529, 18 *Atl*. 818, the majority of the Court (Chief Justice Comegys dissenting) refused to admit the testimony of Mr. Sanborn, who was a student at law in the office

of Mr. Bird, the counsel in the cause, and who had actively assisted his preceptor in the preparation of the case, "all the way through, in examining the authorities, collecting the cases, and examining witnesses." It was held that a student at law who had so thoroughly identified himself with his preceptor's case was as incompetent to testify as the counsel himself. It was proposed to use Mr. Sanborn to contradict an important witness who had testified for the defendant. In the case of *Pritchard v. Henderson*, 3 *Pennewill* 143, 50 *Atl.* 217, the Court held that Mr. Constable, the son of the counsel for the plaintiff and practicing in his father's office, could not be used as a witness in the case, because he had assisted in preparing the case by calling upon witnesses, talking with them, and securing their attendance at the trial. But while the Court in the two cases last mentioned seem to have extended the rule farther than had been previously done, it will be noted that the persons excluded as witnesses were not only closely connected with the counsel in the case and had actively assisted in its preparation, but in the first case the witness was called to testify upon a controverted point, which affected the merits, and in the second it was not disclosed what the witness was to prove.

But the latest case upon the subject, *Jolls v. Keegan*, 4 *Pennewill* 21, 55 *Atl.* 340, in which the opinion of the Court was delivered by Chief Justice Lore, who had delivered the opinion in the case of *Pritchard v. Henderson*, is especially interesting as showing that the Court had never intended to lay down the broad rule that an attorney would be incompetent to testify in any case simply because he was, or had been, counsel for one of the parties. In this case J. Frank Biggs, Esq., who had been counsel, was called to the stand, on behalf of the plaintiff, and asked to detail a conversation that he had with the defendant. Objection was made for the defendant on the ground that Mr. Biggs, having been counsel in the case, was disqualified as a witness under the rulings of the Court. The Court, speaking through the Chief Justice, said: "We have never decided that an admission made by the opposite party to an attorney of the other side could not be put in evidence." It being then stated that the Court would not

allow the person who was in the counsel's office to testify in the case, the Court said:

"That was based upon the ruling of privileged communications between lawyer and client. That we would not allow, but we have never held that if the adverse party goes either to the other party, or counsel of the other party, and makes an admission, that he cannot be contradicted as to that either by the party himself or by his attorney. We think that this testimony ought to be admitted, and the witness allowed to testify, upon the ground that it is an admission by a party against his own interest to the counsel of the adverse party, and who is not even counsel now."

It appears, therefore, from the latest decision in this State upon the question, that counsel in the case may be a witness to prove an admission made by the adverse party, and it further appears that such an admission cannot be regarded in any sense as a confidential or privileged communication. It can hardly be deemed necessary to cite authorities to sustain the proposition that an attorney, to whom statements or admissions have been made by the opposite party, is not thereby placed in such confidential relations with that party as to be precluded from testifying respecting such statements or admissions. The following cases, however, are cited as fully sustaining such proposition: *State v. Snowden*, 23 *Utah* 318, 65 *Pac.* 479; *Woodruff v. Hurson*, 32 *Barb.* (N. Y.) 557, 563; *Hall v. Rixey*, 84 *Va.* 790, 6 *S. E.* 215; *Herman v. Schlesinger*, 114 *Wis.* 382, 392, 90 *N. W.* 460, 91 *Am. St. Rep.* 922; *Cummings v. Irwin* (Tenn. Ch. App.) 59 *S. W.* 153; *Gerhardt v. Tucher*, 187 *Mo.* 46, 85 *S. W.* 552; *Brown v. Grove*, 80 *Fed.* 564, 25 *C. C. A.* 644; *Marston v. Downes*, 6 *Car. & P.* 381, 25 *E. C. L.* 448; *Henry v. Nubert* (Tenn. Ch. App.) 35 *S. W.* 444. To the same effect is *Wigmore*, in his work *on Evidence, vol.* 4, § 2312.

It is manifest that if counsel may testify to statements or admissions made by the opposite party, he may prove the formal service of a notice on such party, and detail any statements made respecting the same. Such was the testimony given by Mr. Ward in the present case, under objection, and exception was noted to its admission.

Under the authority of the above mentioned cases of

*Solomon v. Loper*, *Crooks v. Purnell*, and *Jolls v. Keegan*, in our own State, and the cases cited from other states, I am clearly of the opinion that the testimony of Mr. Ward was properly admitted, and the exceptions thereto are overruled. Indeed, I think there is no case in this State which can be regarded as in conflict with this position, when the late case of *Jolls v. Keegan* is carefully considered, and especially the interpertation placed by the Court in that case upon the decisions upon which the respondents rely. The testimony given by Mr. Ward was not a confidential communication from client to counsel. It was not even upon a controverted point, neither did it touch the merits of the case in any way. It was simply the service of a formal notice. As was said by the Court in the case of *Crooks v. Purnell*, the act proposed to be proved did not partake in any degree of the character of a confidential communication between counsel and client. It was rather an act done, or a step taken, in the cause by the counsel for the plaintiff. In considering the question of Mr. Ward's ccmpetency as a witness, I have assumed that he was, at the time he served the notice, of counsel for the complainant. This fact, however, is not admitted; neither is it proved. If he was not counsel at the time, and I cannot assume, in the absence of admission or proof, that he was, then his competency may not, I think, be seriously questioned.

Practically the entire testimony for the respondents was generally and specifically objected to, and exceptions noted. The testimony was objected to on the ground that it constituted no legal defense or answer to the complainant's bill of complaint and was therefore immaterial. It was conceded at the argument that a ruling upon such exceptions would amount to a decision of the merits of the case. I have, therefore, concluded it will be much more convenient and satisfactory to decide, in the first instance, the merits of the case. Such decision will necessarily determine indirectly the exceptions, which are very numerous, and a decision of which, directly and specifically, would require much time and labor. I shall consider all the testimony contained in the record in determining whether the bonds in question are void because of

usury, or because of fraud to which Jones, the present holder of the bonds, was a party or had knowledge.

And, first, is there any evidence which establishes, or tends to establish, the charge that the bonds were and are usurious? It is unnecessary in this opinion to review the testimony, which is very voluminous.

The undisputed facts show an issuance of the bonds, covered by the mortgage, under a construction contract with the Fairmount Construction Company, for the building and equipping of the railway, and in payment for material, labor and services furnished by said construction company to the said railway company. By far the larger part of the bonds were issued to the construction company under the construction contract proper, and the remainder for extra services, work and labor. There is nothing in the record to show the bonds, or any part of them, were not used for the purpose for which the charter of the company, and the resolutions of the stockholders and directors of the company, authorized them to be used. Is there anything in the transaction between the railway company and the construction company respecting the issuance of the bonds in question upon which usury can be predicated? Certainly not, unless the transaction, which was apparently a delivery of bonds in payment for work and labor performed and materials furnished, was in fact a loan. Does the record show, or even tend to show, that such was the intention of the parties? Was the contract, or agreement, made between the two companies a *bona fide* transaction, as it appears to have been, or a mere cover designed to conceal the real intention of the parties, and effectuate a loan?

The testimony is clear that the road was built and equipped by the Fairmount Construction Company and its subcontractor, and apparently the bonds were issued to the construction company in payment therefor under a contract entered into between the railway company and the construction company. Is there any testimony at all to indicate that the transaction under which the railway company paid to the construction company the bonds in question was a lending of money? It must be conceded that if there was no loan there was no usury.

Then the most important question to be determined is, was there a loan? What, under the authorities, is the test? Without referring to the many authorities upon this point, we will consider the leading case cited by the respondents, and upon the reasoning of which they mainly rely. In that case, *Schermerhorn v. Talman, et al.*, 14 *N. Y.* 93, the Court said:

"To constitute usury there must be a loan of money or its equivalent. The common expedient resorted to, therefore, to evade the statute, is to give to the transaction the form of a sale, instead of a loan; a disguise which, whenever it can be discovered, is stripped off by the courts and the transaction declared usurious. Goods are frequently purchased upon a credit and immediately resold at a sacrifice for cash for the purpose of raising money. To establish the allegation of usary in such a case, it is necessary to prove that the price agreed to be paid to the original vendor was more than the value of the goods, and, also, that a loan was intended under the form of a sale. These two facts must co-exist or there is no usury."

The facts in the *Schermerhorn Case* are in no way analogous to those in the case at bar. In the one the transaction purported to be a sale or exchange of securities, the object of which was to raise money. It made no difference, the Court held, whether money or securities were given. If one of the parties received in the transaction securities which, upon their face, would yield him more than the legal rate of interest, it was in fact a loan, and usurious. The case is referred to simply to show that the two essential things that must appear, in order that the transaction may be regarded as a loan, are (1) that the price agreed to be paid must be more than the value of the property received; (2) that a loan was intended under the form of a sale. We will assume that the work, labor and materials furnished by the construction company were worth much less than the par value of the bonds. But that alone will not make the transaction a loan. If it does, then in every case where the thing done, or furnished, is worth less than the amount paid, or secured to be paid, there would be a loan, and a violation of the law against usury.

There must, according to the *Schermerhorn Case*, be something else proved before the transaction can be held to be a

loan, viz.: That a loan was intended under the form of a sale. Of course, it is not meant that such intention must appear upon the face of the dealings between the parties, because, if such were the law, the real purpose could rarely be uncovered, and the statute would be easily evaded and violated. But it is meant that such facts or circumstances must be proved as are sufficient to show that the real intention of the parties was to make a loan. What are the facts or circumstances proved in the present case which will reasonably warrant such a conclusion? Unquestionably it was the intention of the railway company to build a road. They asked for bids for the construction of the road, and accepted the lowest. 'The charter of the company authorized the building of the road, and the raising of money by mortgage or bonds to pay for the same. Bonds were executed and secured by a mortgage on the property of the railway company. The bonds were directed by the company to be delivered to the president, and the records of the company show that they were paid to the construction company from time to time as the work progressed, until the entire issue of $150,000 were paid out, either for the work and materials provided for in the original contract or for extra work and materials.

Substantially and practically these are the material facts disclosed by the record, and the only clearly proven fact or circumstance relied upon to establish usury is that the value of all the work, labor and materials furnished in the making of the road by the construction company, and its sub-contractor, did not exceed $135,000. One witness says the entire value was a little less than $100,000. The bonds issued to pay for such work, labor and materials amounted to $150,000. The contract also authorized the issuance to the construction company of a large amount of the capital stock of the railway company.

It is contended by the respondents that E. Clarence Jones, the present holder of the bonds, not only had full knowledge of these facts, but of all the facts connected with the issuance of the bonds; that the dealings of the railway company respecting the bonds were in fact with Jones, the construction company being used to conceal Jones' connection with or partici-

pation there'n; and that all of such facts taken together are sufficient to prove the charge that the bonds were tainted with usury, or at least that the transactions which were apparently between the two companies, but really between the railway company and Jones, were of such a fraudulent character as to invalidate the bonds. I will consider the testimony relied upon to establish fraud on the part of Jones later in the opinion.

It may be conceded that the construction company and those to whom its bonds and stock were sold, profited largely by the contract made with the railway company. And it may be assumed that construction companies generally bid in such a way that there shall be a generous margin between the actual cost of the work and materials and the face value of the securities they expect to receive. The bonds may have to be negotiated at less than their face, and the stock may be worth nothing at all. The road may be a success, or it may be a failure. Such conditions no doubt enter very materially into most contracts made for the building of roads for railway and railroad companies, and without such apparent profits perhaps very few such roads would be built. In the case of the road in question, while the difference between the cost of the road and the face of the securities paid therefor was large, and very large, it nevertheless appears from the testimony that the contract made was the best the railway company could obtain. The company received three bids, and accepted the lowest, and the one that was $20,000 lower then any other.

After carefully considering all the testimony in the case, I am clearly of the opinion that, tested by any principle of law or reason, the contract or transaction between the railway company and the construction company respecting the bonds in question was not usurious, and that said bonds are not unenforceable or uncollectible on that ground. I have not deemed it necessary to support my conclusion by the citation of authorities. It is conceded that there must be a loan in order that there may be usury. It is equally clear that a transaction which is apparently a sale, or exchange, cannot be held to be a loan unless there is something in the testimony to show that such was the intention of the parties, or the facts are

such as to indicate that the transaction was a loan under the cover of a sale or exchange.

There remains to be considered the further contention of the respondents that, even though the transaction respecting the bonds should be held not to be a loan, it was nevertheless of such a fraudulent character as to make the bonds void and uncollectible in equity. I understand it to be admitted that such fraud would not avail as a defense against an innocent holder of such bonds. But it is insisted that Jones, the present holder of the bonds, is not an innocent holder, but had full knowledge of all the facts and circumstances attending, or surrounding, the issuance of the bonds, and was in fact a party to the alleged fraud. After all that has been said in this opinion concerning the charge of usury, it does not seem necessary to discuss at much length the question of fraud. In dealing with the facts, a determination of the one question must necessarily largely determine the other. And if the evidence fails to show that the contract between the railway company and the construction company was fraudulent it would seem needless to consider the knowledge and conduct of Jones in connection therewith, unless the contract which was apparently with the construction company was in fact with Jones, and fraud was perpetrated between him and the officers of the railway company in connection with the issuance of the bonds. Fraud is never presumed. It must be proved. Has there been any such proof in this case? It is a fact of some significance, although perhaps not material, that years elapsed after the issuance of the bonds before there was apparently any suspicion of fraud. Their validity as a first lien on the property of the railway company seems to have been unquestioned, and in the merger agreement between said company and the New Castle & Delaware City Railway Company the validity of said bonds was distinctly recognized, and their payment provided for. This was about eight years after the issuance of the bonds.

From the facts disclosed by the record it seems not unfair to assume that holders of stock, and of subordinate bonds, must have purchased the same with full knowledge that the bonds secured by said mortgage, and now in question, consti-

tuted a paramount lien against the property of the company. The only fact clearly proved, that I can discover in the record, upon which the respondents rely to establish fraud between the construction company and the railway company, is that the bonds were grossly in excess of the value of the work, labor and materials in payment for which they were issued. But inasmuch as that question has been discussed in dealing with the charge of usury, it need only be said here that the evidence does not in my opinion establish any fraud between the railway company and the construction company that would justify this Court in holding said bonds void and uncollectible.

It would seem to be a reasonable and necessary conclusion, after a careful examination of all the testimony, that the respondents have failed to establish any fraud on the part of Jones in connection with the bonds in question. On the contrary, the uncontradicted testimony shows that the bonds came into the possession of Jones, the present holder, in due course of business, without notice of any defect, whether of usury, fraud or illegality. The said bonds, therefore, not having been shown to be usurious, or so tainted with fraud as to be void, invalid and uncollectible in equity, the prayer of the complainant is granted.

Let a decree be entered accordingly.

On October 6th, 1910. a decree in accordance with the foregoing opinion was submitted to the Chief Justice by the solicitors for the complainant. The solicitor for the defendant, Wilmington, New Castle and Southern Railway Company, objected to the form of the decree, and the matter was heard on October 14th, 1910, the objections and contentions of the solicitors being stated in the following opinion.

THE CHIEF JUSTICE: I have considered as carefully as I could, since the last hearing, the several objections made by the defendants to the decree proposed by the complainant, and will briefly give the reasons for the conclusions I have reached.

In order to have some record of all the objections made, and their determination, I will repeat here what I stated orally

in passing upon the first objection urged, which objection was to the amount stated to be due and collectible on the bonds; it being claimed that the holders of the bonds were not entitled, under the facts and circumstances disclosed by the record, to collect in this proceeding the face of their bonds. I gave counsel for the defendants an opportunity to produce, if they could, authorities to sustain their contention, but none in point were cited. It appeared that in every case the bond or bonds in question were not such as were negotiable and passed by delivery, but were such as are ordinarily secured by a mortgage on real estate, were transferable by assignment and subject of course to all the equities that existed between the original parties. The bonds in question here are not of such character. They pass by mere delivery and the holders are entitled to collect their face amount or value.

It is claimed that a final decree directing the sale of the railway property covered by the mortgage cannot be made by this Court until the extent and amount of all liens, if any there are, prior to the mortgage have been ascertained, and the property subject to the lien of the mortgage has been specifically and definitely determined. And it is insisted that a master should be appointed to ascertain such facts and report his findings to the Court. One authority has been cited in support of this contention, and that is the case of *Parsons v. Robinson*, 122 *U. S.* 112. In that case the Court had appointed a master to ascertain the prior liens, and the properties bound by the mortgage. Presumably there were such liens, and clearly there was much uncertainty respecting the properties the mortgage covered. Evidently there were after acquired properties of considerable extent and value, and it was uncertain whether the mortgage covered them or not. The situation was manifestly a very complicated one, and yet the lower Court undertook to make a final decree directing the sale before the master had made his report. The Supreme Court, upon appeal, in stating the question to be determined, said: "This is a motion to dismiss an appeal because the decree appealed from is not a final decree." The appellate court could not do otherwise than hold that a master having been appointed to ascertain

certain facts deemed to be important and essential in the case, a final decree could not be made until the master had made his report, and until such facts were determined. It was said by the Court that inasmuch as the extent and amount of all liens prior to said general mortgage upon the property thereby covered had not been determined, and full and detailed statements of the several properties subject to the alien of the general mortgage have not been furnished to the Court, and it not having been determined what the order of sale of said mortgaged properties should contain, nor what should be the form of the advertisements therefor, a final decree could not be made. Clearly the Court could not make a final decree.

But the facts in that case are not at all similar to those in the present case. The record before me sufficiently shows that the mortgage to be foreclosed constitutes the first lien upon the properties covered thereby, with the possible exception of some unpaid taxes which became due prior to the appointment of the receivers. The property bound by the mortgage belongs to a single railway company, and not to several companies; and it seems to be clearly defined. Certainly there is no such condition as existed in the *Parsons Case*. There is no suggestion of uncertainty concerning any of the property except one freight car bought by the receivers. I do not think the alleged unascertained facts in this case are of sufficient importance, even if the allegations are true, to justify the Court in referring the same to a master. Such a reference would cause further delay, and probably considerable delay, in the making of the final decree. This would be in my opinion, under all the circumstances, unreasonable.

I have assumed, so far, that any unpaid taxes constituted a lien upon the railway property, but there are two statutes of this State, not referred to in the argument, one of which (Rev. Code, p. 119) limits the collection of taxes to two years from the date of the warrant, and the other (Rev. Code, pp. 125, 126) limits the lien of state, county, school and town taxes to two years. It being admitted that all taxes that have become due since the appointment of the receivers, more than two years ago, have been paid, it is difficult to see how there

can be any taxes that constitute a prior lien against the property covered by the mortgage.

Objection has been made to that part of the proposed decree which provides that any one intending to be a bidder at the sale shall make a deposit twenty-four hours before the commencement of the sale. It is contended (1) that such a requirement is unnecessary and unfair, and will prevent or discourage bidding; (2) that if a deposit is required to be made before the sale by any person intending to be a bidder, such person should be permitted to make it at any time before the sale. Of course the terms of sale should be reasonable, and of such a character as to encourage bidding, but it is also important that in a sale of this kind there should be some requirement that will evidence the *bona fides* of the bidder, as well as secure the payment of the costs. I think, therefore, the deposit should be required, but I also think the decree should provide that it shall be made at any time before the sale.

The proposed decree also provides for a further deposit to be made after the acceptance of the bid, and before the property is struck off. The only objection to this provision seems to be it permits the deposit to be made in bonds secured by the mortgage, and thus gives an unfair advantage at the sale to the holder of such bonds. But I think it is not only usual, but also reasonable, in ordering sales of this character, for the Court to direct that the deposit required to be made by the successful bidder may be made in bonds to which the proceeds of the sale would have to be applied. And there can be nothing unfair in requiring the person whose bid has been accepted to make such a deposit as will insure his compliance with the other terms of sale. If he intends to pay the whole purchase money, he cannot reasonably object to the payment of a comparatively small part thereof at the time of his purchase; and, besides, if the second deposit is required, the first deposit need not be so large as it would otherwise have to be.

It was suggested, rather than objected to, that there is no minimum price or sum stated in the decree at which the mortgaged property could be sold. In respect to such suggestion it need only be said that it will be for the Court to determine when

the sale is returned whether the price for which the property was sold was adequate under all the circumstances.

It was very strongly urged in behalf of the defendants that the time given in the proposed decree in which to redeem, being only five days, is wholly inadequate and unreasonable. Such a period does seem to be too brief, but I do not think much time should be allowed or expected. The only rule that I know of which applies to this question is that the time allowed should be reasonable. What is a reasonable time must depend upon the facts and circumstances of the particular case. The facts and circumstances of this case, as shown by the record, would not warrant the Court in extending the time to much length. It appears from the record that the defendant company had several months in which to redeem after notice of default was given and before suit to foreclose was begun. And it also appears that the defendants have had the opportunity to redeem during the three years consumed by litigation since the foreclosure suit was commenced. It would seem that the admittedly insolvent condition of the company would make redemption impossible at any time; but, even if that is not so, I am of the opinion that not much additional time should be granted. While two months are usually allowed in ordinary cases, I think, under the unusual circumstances of this case, one month would be a reasonable time.

I come now to the last and perhaps the most serious and troublesome objection with which I have had to deal. I refer to the objection made to the appointment of a master to make the sale. It is contended by the defendants that under the law of this State a sale of real estate by the order of the Chancellor cannot be made by a master, but only by the sheriff, or a party to the suit. The authority cited in support of such contention is a statute of this State. *Rev. Code, p.* 706, § 12. I have no doubt that prior to the enactment of said statute the Court of Chancery could appoint a master to sell real estate, and that the authority to sell was not confined to the sheriff. I will not say that the Chancellor has not such power still, because I am not prepared to hold that the words of the statute are exclusive, so as to prevent the appointment of some other

agent to make the sale, such as a master. There are authorities supporting the Chancellor's right to make such appointment. I believe there are cases, and this is one of them, where the decree of sale could be better carried out, or executed, by a master than any one else. But the most important thing in connection with the sale is that it shall be legal and valid, and, if possible, entirely free from any question of illegality or invalidity. Certainly there should not be, if it may be avoided, any question or doubt about the power and authority of the agent appointed to make the sale. There does seem to be some question respecting the authority of a master, and such question can be removed by the appointment of the sheriff or a party to the suit, as provided in the statute. Even if I had no doubt about my power to appoint a master to effect the sale, I would not exercise it if I believed there was any ground for a different opinion. I say this because I do not want any one who might desire to bid at the sale to refuse or hesitate because of any doubt respecting the authority of the agent appointed to make the sale. The sale when made should be not only fair, but, so far as possible, free from any question of illegality. And even though the sale, if made by a master, would be valid and legal, the Court might, upon its return, be asked to refuse confirmation on the ground that the doubt of the master's authority deterred persons from bidding. It may be thought by counsel for the complainant that there is no reasonable ground for the belief that a master cannot make the sale. I have carefully considered the argument upon this question, and while I appreciate its force I am not sure of its conclusiveness. It seems to me there is some room for a different opinion.

The statute provides that all real estate in this State shall be liable to be sold, by order of the Chancellor, by the sheriff or by any party to a suit; that such sales shall be as available in law, to the vendees, as sales of land seized and sold upon judgment and execution are by virtue of any law of this State. I can understand how one might think, after reading this statute, that there is no sale of real estate, by order of the Chancellor, contemplated or recognized by the law of the State except such as is referred to in said Act. And in support of this view

may be mentioned the fact that sales by Chancery decree have been generally, if not altogether, made by the sheriff, or the receivers who were parties to the suit. Such has been the invariable practice even in sales to foreclose mortgages. It is true they were not mortgages like the one here, except in a recent case where receivers were appointed. But, after all, this is a mortgage, and, although its provisions are very different from those contained in the ordinary mortgage, is there any sufficient reason for departing from the invariable practice that has hitherto prevailed, and appointing a master? For some reasons I would prefer to appoint a master, but I do not think under all the circumstances I would be justified in doing so.

While I have concluded, for the reasons given, not to appoint a master to make the sale, I also think it would not be advisable to appoint any party to the suit. The agent to be appointed, therefore, must be the sheriff of the County, the official who has heretofore been almost invariably directed to make sales under decrees of the Court of Chancery, even in cases of foreclosure of mortgages.

I think I have covered all the objections made to the decree submitted by the complainant, and direct that said decree be so changed or modified as to conform hereto.